## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERTA RUANE and JOHN RUANE, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| HOMETAP EQUITY PARTNERS, LLC, HOMETAP HOLDINGS II, LLC, and HOMETAP INVESTMENT PARTNERS II, L.P., | |
| Defendants. | |

## CLASS ACTION COMPLAINT

This class action complaint is brought by Plaintiffs Roberta Ruane and John Ruane ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class"), against Defendants Hometap Equity Partners, LLC, Hometap Holdings II, LLC, and Hometap Investment Partners II, L.P. ("Defendants" or "Hometap"). The allegations set forth below are based on personal knowledge as to Plaintiffs' own acts and on investigation conducted by counsel as to all other allegations.

## PARTIES

1.      Plaintiff Roberta Ruane is a citizen and resident of Pennsylvania.

2.      Plaintiff John Ruane is a citizen and resident of Pennsylvania.

3.      Defendant Hometap Equity Partners, LLC is a Delaware limited liability company with its principal place of business in Boston, Massachusetts. Hometap Equity Partners, LLC is registered as a foreign limited liability company doing business in Pennsylvania under 15 Pa. Cons.

Stat. § 411. Hometap Equity Partners, LLC is the ultimate owner and exerts full control over Hometap Holdings II, LLC and Hometap Investment Partners II, L.P.

4. Defendant Hometap Holdings II, LLC is a Delaware limited liability company with its principal place of business in Boston, Massachusetts. Hometap Holdings II, LLC is the general partner of Hometap Investment Partners II, L.P.

5. Defendant Hometap Investment Partners II, L.P. is a Delaware limited partnership with its principal place of business in Boston, Massachusetts. Hometap Equity Partners, LLC is registered as a foreign limited partnership doing business in Pennsylvania under 15 Pa. Cons. Stat. § 411. Hometap Investment Partners II, L.P is registered as a private equity fund with the SEC.

## JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are Class members who are diverse from Defendants, and (4) there are more than 100 Class members.

7. This Court has general personal jurisdiction over Defendants pursuant to 42 Pa. Cons. Stat. § 5301(a)(2)(i) because Defendants are registered to do business in this state.

8. This Court has personal jurisdiction over Defendants because Plaintiffs' claims arise out of Defendants' contacts with this district.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## FACTUAL ALLEGATIONS

### I. Hometap's "Home Equity Investment"

10. According to Hometap's website:

2

> Hometap is a Boston-based fintech company that began in 2017 to make homeownership more accessible and less stressful. We're here to help people get more out of homeownership so they can get more out of life. We're focused on the homeowner above all else. We're real. We're human. We're clear. We're good owners and neighbors.[1]

11. Hometap offers to homeowners a financial product that it markets as a "Home Equity Investment" ("HEI").

12. An HEI is a contract between Hometap and a homeowner by which Hometap provides the homeowner an upfront payment of cash, and then when the contract is settled at or before 10 years, Hometap receives in return a predetermined share of the home's value.[2]

13. Hometap provides a typical example on its website: On a $500,000 home, the homeowner would receive a cash payment of 10% of the home's value, or $50,000. After 10 years of "moderate appreciation," the home's value is now $688,447. Per the contract, Hometap is now entitled to 20% of the home's value from the homeowner, or $137,689, known as the "Hometap Share." If the home's value decreases instead, Hometap is entitled to only a 15% share of the home.[3]

14. The HEI contract is styled not as a loan, but as an "option purchase agreement."

15. Under this contract, the upfront payment to the homeowner, the "Investment Amount," is actually Hometap's purchase of "an exclusive and irrevocable option (the 'Option') to acquire an undivided percentage interest (the 'Hometap Percentage') of fee simple title ownership" in the home.

---

[1] https://www.hometap.com/about
[2] https://www.hometap.com/how-it-works
[3] https://www.hometap.com/how-it-works

16.     At commencement of the HEI, the homeowner is responsible for origination fees, including a 3% investment fee, appraisal fee, title charges, and mortgage filing fees, which come out of their initial upfront payment.

17.     Hometap secures its future interest in the property with a mortgage instrument.

18.     The option period is 10 years, with an optional one-time extension of ten years at Hometap's discretion.

19.     Hometap may exercise the option at the end of the option period, or earlier if the home is sold or transferred.

20.     If Hometap "exercises" its option, then it obtains a share of the property equivalent to the Hometap Percentage.

21.     In consideration for the transfer of the Hometap Share of the property when the option is exercised, Hometap pays the homeowner 1% of the initial Investment Amount (that is, 1% of the initial amount received by the homeowner, not 1% of the home's value), called the "Exercise Payment."

22.     The homeowner has the right to repurchase the Hometap Share in cash at any time up to and including when Hometap exercises the option.

23.     The Hometap Share is calculated by multiplying the Hometap Percentage by the sale price or appraised value of the home.

24.     There is a "cap" on the Hometap Share based on 20% annualized appreciation of the home's value.

25.     If a homeowner does not repurchase the Hometap Share, then Hometap and the homeowner would then jointly own the property within a legal form chosen exclusively by Hometap.

26.    The contract requires that homeowners keep current on mortgage, tax, and insurance payments and maintain the property.

27.    The contract requires that the property remain owner-occupied as the homeowner's primary residence, absent express permission at Hometap's sole discretion.

28.    Homeowners may not obtain any other mortgage, loan, or lien on the property without Hometap's consent.

29.    Homeowners have a right to cancel the contract within three business days of signing.

30.    The contract contains an arbitration provision and class action waiver.

## II.    HEIs Are Not Option Contracts

31.    Hometap describes an HEI as:

> A flexible, alternative financing solution that allows homeowners to access their equity in cash without monthly payments to fund what matters most to them.[4]

32.    Hometap's explanation of why this product is called an "investment" does not make the details of the product any clearer:

> You'll probably see a lot of different terms for what we do: home equity agreement, home equity investment, etc. And many mean, more or less, the same thing. But there's a good reason that we call it an investment. When you access your equity through Hometap, it's structured as an investment — based on your home's value over time. It's a long-term, equity-based way to access funds that aligns with your goals and your home's potential.[5]

33.    Hometap states that an HEI is not a home equity loan:

> Hometap makes home equity investments in people's homes. Unlike with a home equity loan, homeowners make no monthly payments to Hometap during their Investment term, there are no employment, income, or debt-to-income requirements, and we have no guaranteed

---

[4] https://www.hometap.com/about
[5] https://www.hometap.com/about

return on the money we've invested. When the homeowner settles the Investment, they'll pay a previously agreed-upon share to Hometap.[6]

34.    Hometap's website also compares an HEI to other forms of traditional loans, including a home equity line of credit, cash-out refinance, and reverse mortgage[7]:

| | Home Equity Investment | Home Equity Loan | HELOC | Cash-Out Refinance | Reverse Mortgage |
|---|---|---|---|---|---|
| No payments for up to 10 years | ✓ | ✗ | ✗ | ✗ | ✓ |
| No monthly payments | ✓ | ✗ | ✗ | ✗ | ✓ |
| No debt-to-income requirements | ✓ | ✗ | ✗ | ✗ | ✓ |
| No income requirements | ✓ | ✗ | ✗ | ✗ | ✓ |
| Fast funding | ✓ | ✗ | ✗ | ✗ | ✗ |
| Age eligibility 18+ | ✓ | ✓ | ✓ | ✓ | ✗ |

35.    An HEI differs from a home equity loan, home equity line of credit, or cash-out refinance because it has no monthly payments, no income requirements, and it is fast.

36.    Like a reverse mortgage, an HEI has no monthly payments and no income requirements. The only difference is that an HEI is faster and requires the homeowner to only be 18 years old.[8]

---

[6] https://www.hometap.com/how-it-works
[7] https://www.hometap.com/home-equity-investment-vs-traditional-loans
[8] https://www.hometap.com/home-equity-investment-vs-traditional-loans

37.    Despite Hometap's marketing and vague attempts at distinguishing an HEI from a loan, an HEI acts much the same as a home equity loan or reverse mortgage.

38.    Hometap's comparison chart illustrates that Hometap is attempting to combine the most favorable aspects of a home equity loan, home equity line of credit, cash-out refinance, and reverse mortgage, while making it faster, open to more people, and subject to less regulation.

39.    Hometap inserts carefully chosen language into the HEI contracts in an attempt to avoid characterizing them as loans.

40.    Hometap says that an HEI is not a loan, but an "option purchase agreement." This designation is entirely illusory and is used only to avoid regulations that other residential mortgage loans are subject to.

41.    A traditional "call" option is a contract that gives the buyer of the option the right, but not the obligation, to buy an underlying asset from the option seller at a strike price at or before the expiration date. The buyer and seller are both speculating as to whether the market price of the underlying asset will go up or down before the expiration date. If the price goes up, the buyer can "exercise" the option by buying the asset at the lower strike price and then sell at the higher market price, thereby earning a profit. If the price goes down, the buyer would have no reason to exercise the option because the market price of the asset is lower, rendering the option worthless. The seller of the option always receives the initial premium paid for the option but could still lose money if the option is exercised.

42.    The equivalent of a strike price of an HEI contract is the Exercise Payment, a nominal amount set at 1% of the initial Investment Amount (the upfront amount paid to the homeowner). For example, if an initial Investment Amount is 10% of the home's initial value, then the strike price is 1% of that, or 0.1% of the home's initial value. Thus, when exercising the option,

Hometap can obtain 20% of the home's future value in exchange for a cash payment of just 0.1% of the home's initial value. This exchange is meant to maintain the guise of an option in name only because there is no reasonable scenario in which Hometap would not exercise the option considering the gross disparity. Hometap wrote the HEI contract to guarantee that exercising it would always be profitable, so there is no "option" at all.

43.     Similarly, there is never a scenario in which the homeowner could profit from this option. Not only must the homeowner pay back part of the initial Investment Amount in fees to originate the HEI contract, but the Investment Amount is immediately lower than the Exercise Amount as soon as the contract is created. Even if a homeowner were to buy out of their contract at the earliest opportunity, they would immediately owe to Hometap far more than what they initially received because the Hometap Share is always much higher than the Investment Amount. That is the opposite of how traditional options are priced, markets for which recognize that sellers have unlimited risk, and thus demand a higher premium at the outset. There is no reasonable person who would sell a true option contract at that price.

44.     Further, any risk that the value of the home could drop so much that Hometap is not profitable is eliminated by the HEI contract's requirement that the homeowner maintain home insurance and maintain the value of the property. And Hometap has the right to intervene if the homeowner does not maintain the value of the property. The burden of maintaining the value of Hometap's interest in the property is therefore borne entirely by the homeowner. Of course, Hometap would not enter into a contract with a homeowner with which there was a substantial risk that the value of their home would fall.

45.     The elements that Hometap inserts into the HEI contract to give it some technical characteristics of an option are entirely illusory.

46.     When the "option" façade is recognized for what it is then it is clear that an HEI is simply a mortgage-secured loan with a single huge payment that effectively results in an outrageously high interest rate.

## III.   HEIs Are Illegal Mortgage Loans

47.     The Truth in Lending Act of 1968, 15 U.S.C. §1602 *et seq.* ("TILA"), protects borrowers by requiring lenders to disclose standardized loan terms and costs.

48.     The Home Ownership and Equity Protection Act of 1994 ("HOEPA") amended the TILA to provide greater protections against predatory lending.

49.     The TILA's implementing regulations, Regulation Z, 12 C.F.R. Part 1026, generally require that disclosures be made "clearly and conspicuously" and prohibit misleading, deceptive, and unfair practices associate with consumer credit.

50.     Under the TILA, "[t]he term 'residential mortgage loan' means any consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling . . . ." 15 U.S.C. § 1602(dd)(5).

51.     With respect to residential mortgage loans, the TILA has a stated purpose "to assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2).

52.     Mortgage originators must be licensed under applicable federal and state laws. 15 U.S.C § 1639b(b)(1)(A).

53.     Mortgage lenders are obligated to "make[] a reasonable and good faith determination based on verified and documented information that, at the time the loan is

consummated, the consumer has a reasonable ability to repay the loan, according to its terms, and all applicable taxes, insurance (including mortgage guarantee insurance), and assessments." 15 U.S.C. § 1639c(a)(1).

54. "[A] consumer's ability to repay a residential mortgage loan shall include consideration of the consumer's credit history, current income, expected income the consumer is reasonably assured of receiving, current obligations, debt-to-income ratio or the residual income the consumer will have after paying non-mortgage debt and mortgage-related obligations, employment status, and other financial resources other than the consumer's equity in the dwelling or real property that secures repayment of the loan. A creditor shall determine the ability of the consumer to repay using a payment schedule that fully amortizes the loan over the term of the loan." 15 U.S.C. § 1639c(a)(3).

55. Residential mortgage loans are required to have certain disclosures to ensure certain terms are specifically states in terms that homeowners understand, including:

a. "[t]he 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(a)(2)(A);

b. "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," 15 U.S.C. § 1638(a)(2)(B);

c. "[t]he 'finance charge', not itemized, using that term," 15 U.S.C. § 1638(a)(3);

d. "[t]he finance charge expressed as an 'annual percentage rate', using that term," 15 U.S.C. § 1638(a)(4);

e. "[d]escriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price,'" 15 U.S.C. § 1638(a)(8);

f. "[w]here the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," 15 U.S.C. § 1638(a)(9);

g.    "the total amount of interest that the consumer will pay over the life of the loan as a percentage of the principal of the loan," 15 U.S.C. § 1638(a)(19);

56.    The TILA prohibits residential mortgage loans from having mandatory arbitration provisions. 15 U.S.C. § 1639c(e)(1).

57.    The Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 *et seq.* ("RESPA"), also requires certain disclosures and governs the settlement process.

58.    Under RESPA regulations, a mortgage servicer may not charge a fee to provide information to a borrower, such as the payoff amount of the loan. 12 C.F.R. § 1024.36(g)(1).

59.    The Pennsylvania Mortgage Licensing Act, *et seq.*, similarly requires a lender to provide a payoff statement upon request. 7 Pa. Stat. and Cons. Stat. Ann. § 6121(7).

60.    The Pennsylvania Mortgage Licensing Act, *et seq.*, further prohibits anyone engaged in the mortgage loan business to "[a]dvertise, cause to be advertised or otherwise solicit whether orally, in writing, by telecast, by broadcast or in any other manner any statement or representation which is false, misleading or deceptive." 7 Pa. Stat. and Cons. Stat. Ann. § 6123(a)(3).

61.    The Pennsylvania Usury Law, 41 Pa. Stat. Ann. § 101 *et seq.*, sets the maximum interest rate for a residential mortgage at "the Monthly Index of Long Term United States Government Bond Yields for the second preceding calendar month plus an additional two and one-half per cent per annum." 41 Pa. Stat. Ann. § 301(b).

62.    If a residential mortgage has a variable interest rate, the following additional requirements apply:

> (1) That the index for determining increase or decrease in interest rate shall be the lawful rate of interest as determined under subsections (a), (b) and (c) for residential mortgages.

(2) A requirement that when an increase in the interest rate is required by a movement in a particular direction of the prescribed standard an identical decrease is required in the interest rate by a movement in the opposite direction of the prescribed standard.

(3) The rate of interest shall change not more often than once during any semiannual period and at least six months shall elapse between any two such changes.

(4) The change in the interest rate shall be one-fourth of one per cent in any semiannual period and shall not result in a rate more or less than two and five-tenths percentage points greater or less than the rate for the first loan payment due after the closing of the loan.

(5) The rate of interest shall not change during the first annual period of the loan.

(6) Subject to the provisions of paragraphs (3), (4) and (5), an increase or decrease in the interest rate shall be effected when the index moves in such percentage that the difference between the present index rate and present mortgage rate varies not less than one-fourth of a percentage point from the difference between the index and mortgage rates at the date of the first contracted loan repayment.

41 Pa. Stat. Ann. § 301(e).

### IV.  Hometap Structures HEIs as Unregulated Options in Order to Offer Grossly Unfair and Predatory Terms to Homeowners

63.    An HEI is an extension of consumer credit, a residential mortgage loan, and a high-cost mortgage under the TILA, 15 U.S.C. § 1602, and the Pennsylvania Usury Law, 41 Pa. Stat. Ann. § 101.

64.    Because HEIs are in reality high-interest residential mortgage loans and not option contracts, they are subject to the statutory requirements set forth above.

65.    Hometap has failed to adhere to the most important mortgage requirements that are meant to protect homeowners from predatory practices.

66.    Hometap does not evaluate homeowners' ability to pay back an HEI loan.

12

67.     Rather, Hometap relies on its ability to take control of the homeowners' home and force a sale in order to recover its investment.

68.     Hometap's only concern therefore is how much the home is worth and home much it will appreciate.

69.     Hometap falsely represents that its employees act in homeowners' best interests, including access to a dedicated "investment manager":

> **A dedicated, responsive Investment Manager** who guides you through the process from beginning to end and answers your questions in a timely manner.
>
> **Helpful, straightforward, and personalized guidance** that enables you to make smart choices for yourself and your family's unique needs.
>
> **No sales pitches, no pressure, and no judgment…ever.** We mean it.[9]

70.     Homeowners are lured by Hometap's misrepresentations and omissions which lead homeowners into believing that their interests are being protected.

71.     Despite terms in the HEI contract acknowledging that Hometap urged homeowners to seek outside legal and financial advice, Hometap does no such thing, instead intentionally leading homeowners to believe that Hometap is acting as their advisor.

72.     Hometap markets the HEI as an "investment," despite an HEI having none of the characteristics of an investment, such as the potential to earn a profit, at least from the perspective of a homeowner.

73.     Homeowners are led to believe that an HEI is not only an investment, but a good investment, when its terms are grossly unfair and favorable only to Hometap.

---

[9] https://www.hometap.com/our-fresh-approach

74.    Hometap also markets HEIs as an alternative to burdensome debt or a reverse mortgage, despite those financial instruments being more tightly regulated than HEIs and HEIs essentially working in the same way as those instruments, only with much less fair terms.

75.    Hometap targets homeowners who desperately need cash, and who are therefore also unlikely to be sufficiently financially literate to recognize or understand the pitfalls of the HEI contract or able to pay for third-party legal or financial advice.

76.    Hometap takes advantage of its superior bargaining power, knowledge, and influence to induce homeowners into agreeing to HEI contracts.

77.    The terms of an HEI are so grossly unfair and one-sided that a competent legal or financial advisor acting in good faith would never recommend it to a homeowner.

78.    In fact, the terms of an HEI yield annualized interest rates so high that they far exceed maximum usury rates, rendering the contracts illegal.

79.    Another disadvantage of an HEI is that, because it is not considered a mortgage, it does not permit homeowners to take advantage of the mortgage interest deduction.

80.    Taking advantage of its characterization of an HEI as an "option" instead of a regulated mortgage product, Hometap dictates grossly unfavorable terms and intentionally withholds required disclosures that are meant to inform homeowners about the pitfalls of predatory lending practices.

81.    Hometap takes advantage of homeowners by not providing many of the required disclosures for residential mortgage loans under the TILA and HOEPA.

82.    Hometap withholds various TILA disclosures, including the finance charge disclosure, 15 U.S.C. §1635(i), and credit terms disclosure, 15 U.S.C. §1638.

83. HEI contracts are "high-cost mortgages" within the meaning of 12 C.F.R. § 1026.32(a)(1).

84. Hometap withholds additional TILA and HOEPA disclosures for "high-cost mortgages," including conspicuous disclosure of the risks of the loan, APR, and payments. 12 C.F.R. § 1026.32(c).

85. An HEI includes a balloon payment which is prohibited in high-cost mortgages. 12 C.F.R. § 1026.32(d)(1)(i).

86. When a homeowner ultimately does want to get out of their HEI, they are required to pay closing fees, including an appraisal fee before they can even know how much money they owe.

87. Hometap also includes a mandatory arbitration provision in the HEI contract, which is prohibited by the TILA and HOEPA.

## V. Plaintiffs' Experience

88. Plaintiffs purchased their home in Oakdale, Pennsylvania on October 6, 2017, for $387,300.

89. Plaintiffs have lived in their home since they purchased it, and it is their primary residence.

90. In or around March 2020, Plaintiffs experienced financial difficulties due to Plaintiff Roberta Ruane losing her job as a result of the COVID-19 pandemic, and the subsequent pay cut at her new job.

91. Plaintiffs considered taking out a home equity loan to obtain cash to help with their financial difficulties.

92. Plaintiffs discovered Hometap and read about their HEI offering.

15

93.    Plaintiffs liked that an HEI provided an upfront payment, which Hometap referred to as an "investment," that the HEI did not have regular monthly payments, and that it had a ten-year term.

94.    On April 6, 2021, Plaintiffs inquired about getting an HEI through Hometap and signed an agreement with Hometap on May 20, 2021.

95.    Hometap represented to Plaintiffs that an HEI is not a loan and there is no interest.

96.    Throughout the process, Plaintiffs were assured by Hometap's employees that they were making a good "investment."

97.    At all times, Hometap's employees held themselves out as "investment managers" who were advising Plaintiffs on an investment decision.

98.    Plaintiffs reasonably believed that they were being offered a financial product similar to a home equity loan because the Investment Amount was determined based on their equity in their home.

99.    Plaintiffs reasonably believed that the terms of the HEI were favorable because of the advice they received from Hometap.

100.    Plaintiffs reasonably believed that the terms of the HEI were more favorable than other types of loans because of the advice they received from Hometap.

101.    Hometap never revealed to Plaintiffs that an HEI was actually a predatory high-interest loan that was carefully crafted with illusory contract language to avoid regulation.

102.    No Hometap employee ever advised Plaintiffs to seek outside legal and financial advice.

103.    Plaintiffs relied on Hometap's misrepresentations, omissions, and concealment of material information when entering into the HEI contract.

104. Plaintiffs entered into an HEI contract on May 20, 2021, with the following terms:

| | |
|---|---|
| Beginning Home Value | $410,000.00 |
| Investment Amount | $38,979.00 |
| Investment Fee (3% of Investment Amount) | $1,169.37 |
| Third-Party Costs | $699.00 |
| Taxes and Other Government Fees | $413.50 |
| Net Investment Amount | $36,697.13 |
| Hometap Percentage (if Ending Home Value is greater than or equal to Beginning Home Value) | 15.845% |
| Hometap Percentage (if Ending Home Value is less than Beginning Home Value) | 13.204% |
| Hometap Cap (annualized) | 20% |
| Exercise Payment (1% of Investment Amount) | $389.79 |

105. Immediately upon entering into their HEI contract, in order to pay off and exit the contract, in addition to closing costs, Plaintiffs would owe Hometap 15.845% of their home's value, or $64,964.50, approximately 67% more than their Investment Amount.

106. Plaintiffs' home is now estimated to be worth $571,600. If Plaintiff were to payoff and exit their HEI contract at this time, in addition to closing costs, Plaintiffs would owe Hometap $90,570.02, approximately 132% more than their Investment Amount.

107. At the current rate of appreciation, Plaintiffs' home might be worth $797,000 at the end of the 10-year term. If Hometap were to exercise the option at that time, in addition to closing costs, Plaintiffs would owe Hometap $126,284.65, approximately 224% more than their Investment Amount.

108. In consideration of Hometap's obtaining a share of Plaintiffs' home worth $126,284.65 after 10 years, Hometap would pay to Plaintiffs the Exercise Payment of $389.79.

109. When viewed not as an option, but as a mortgage loan, the 10-year repayment represents a 12.47% annual interest rate.

## CLASS ALLEGATIONS

110.    This action is brought as a class action under Fed. R. Civ. P. 23.

111.    The Class is defined as follows:

>   **Nationwide Class:** All persons who entered into an Option Purchase Agreement with Hometap.

>   **Pennsylvania Subclass:** All persons in who entered into an Option Purchase Agreement with Hometap whose underlying property is in Pennsylvania.

112.    The Class excludes the following: Defendants, their affiliates, their current and former employees, officers, and directors, and the judge assigned to this case.

113.    The Class definition may be modified based upon discovery and further investigation.

114.    *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class may be ascertained through discovery of records from Defendants and third parties.

115.    *Commonality*: There are questions of law or fact common to the Class, including, without limitation, whether Defendants engaged in unlawful conduct that entitles Plaintiffs and Class members to relief.

116.    *Typicality*: Plaintiffs' claims are typical of the claims of Class members. Plaintiffs and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendants relating to the same course of conduct, and are entitled to relief under the same legal theories.

117.    *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the interests of the Class. Plaintiffs' counsel are experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case.

18

118.    *Predominance and superiority*: Questions of law or fact common to the Class predominate over any questions affecting individual members because all claims arise out of the same unlawful conduct by Defendants and depend on the same determinations of law and fact. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. There are no difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

119.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

120.    Defendants' unlawful conduct applies generally to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

121.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE TRUTH IN LENDING ACT
### 15 U.S.C. § 1601, *et seq.*
### (on behalf of Plaintiffs and the Class)

122. All preceding paragraphs are incorporated by reference as though fully set forth herein.

123. The Truth in Lending Act of 1968, 15 U.S.C. §1602 *et seq.* ("TILA"), protects borrowers by requiring lenders to disclose standardized loan terms and costs.

124. The Home Ownership and Equity Protection Act of 1994 ("HOEPA") amended the TILA to provide greater protections against predatory lending.

125. The TILA's implementing regulations, Regulation Z, 12 C.F.R. Part 1026, generally require that disclosures be made "clearly and conspicuously" and prohibit misleading, deceptive, and unfair practices associate with consumer credit.

126. Under the TILA, "[t]he term 'residential mortgage loan' means any consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling . . . ." 15 U.S.C. § 1602(dd)(5).

127. With respect to residential mortgage loans, the TILA has a stated purpose "to assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2).

128. Mortgage originators must be licensed under applicable federal and state laws. 15 U.S.C § 1639b(b)(1)(A).

129. Mortgage lenders are obligated to "make[] a reasonable and good faith determination based on verified and documented information that, at the time the loan is consummated, the consumer has a reasonable ability to repay the loan, according to its terms, and

all applicable taxes, insurance (including mortgage guarantee insurance), and assessments." 15 U.S.C. § 1639c(a)(1).

130. "[A] consumer's ability to repay a residential mortgage loan shall include consideration of the consumer's credit history, current income, expected income the consumer is reasonably assured of receiving, current obligations, debt-to-income ratio or the residual income the consumer will have after paying non-mortgage debt and mortgage-related obligations, employment status, and other financial resources other than the consumer's equity in the dwelling or real property that secures repayment of the loan. A creditor shall determine the ability of the consumer to repay using a payment schedule that fully amortizes the loan over the term of the loan." 15 U.S.C. § 1639c(a)(3).

131. Residential mortgage loans are required to have certain disclosures to ensure certain terms are specifically states in terms that homeowners understand, including:

   a. "[t]he 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(a)(2)(A);

   b. "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," 15 U.S.C. § 1638(a)(2)(B);

   c. "[t]he 'finance charge', not itemized, using that term," 15 U.S.C. § 1638(a)(3);

   d. "[t]he finance charge expressed as an 'annual percentage rate', using that term," 15 U.S.C. § 1638(a)(4);

   e. "[d]escriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price,'" 15 U.S.C. § 1638(a)(8);

   f. "[w]here the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," 15 U.S.C. § 1638(a)(9);

21

g.      "the total amount of interest that the consumer will pay over the life of the loan as a percentage of the principal of the loan," 15 U.S.C. § 1638(a)(19);

132.    The TILA prohibits residential mortgage loans from having mandatory arbitration provisions. 15 U.S.C. § 1639c(e)(1).

133.    The Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 *et seq.* ("RESPA"), also requires certain disclosures and governs the settlement process.

134.    Under RESPA regulations, a mortgage servicer may not charge a fee to provide information to a borrower, such as the payoff amount of the loan. 12 C.F.R. § 1024.36(g)(1).

135.    The Pennsylvania Mortgage Licensing Act, *et seq.*, similarly requires a lender to provide a payoff statement upon request. 7 Pa. Stat. and Cons. Stat. Ann. § 6121(7).

136.    The Pennsylvania Mortgage Licensing Act, *et seq.*, further prohibits anyone engaged in the mortgage loan business to "[a]dvertise, cause to be advertised or otherwise solicit whether orally, in writing, by telecast, by broadcast or in any other manner any statement or representation which is false, misleading or deceptive." 7 Pa. Stat. and Cons. Stat. Ann. § 6123(a)(3).

137.    The Pennsylvania Usury Law, 41 Pa. Stat. Ann. § 101 *et seq.*, sets the maximum interest rate for a residential mortgage at "the Monthly Index of Long Term United States Government Bond Yields for the second preceding calendar month plus an additional two and one-half per cent per annum." 41 Pa. Stat. Ann. § 301(b).

138.    If a residential mortgage has a variable interest rate, the following additional requirements apply:

> (1) That the index for determining increase or decrease in interest rate shall be the lawful rate of interest as determined under subsections (a), (b) and (c) for residential mortgages.

(2) A requirement that when an increase in the interest rate is required by a movement in a particular direction of the prescribed standard an identical decrease is required in the interest rate by a movement in the opposite direction of the prescribed standard.

(3) The rate of interest shall change not more often than once during any semiannual period and at least six months shall elapse between any two such changes.

(4) The change in the interest rate shall be one-fourth of one per cent in any semiannual period and shall not result in a rate more or less than two and five-tenths percentage points greater or less than the rate for the first loan payment due after the closing of the loan.

(5) The rate of interest shall not change during the first annual period of the loan.

(6) Subject to the provisions of paragraphs (3), (4) and (5), an increase or decrease in the interest rate shall be effected when the index moves in such percentage that the difference between the present index rate and present mortgage rate varies not less than one-fourth of a percentage point from the difference between the index and mortgage rates at the date of the first contracted loan repayment.

41 Pa. Stat. Ann. § 301(e).

139.    An HEI is an extension of consumer credit, a residential mortgage loan, and a high-cost mortgage under the TILA, 15 U.S.C. § 1602, and the Pennsylvania Usury Law, 41 Pa. Stat. Ann. § 101.

140.    Because HEIs are in reality high-interest residential mortgage loans and not option contracts, they are subject to the statutory requirements set forth above.

141.    Hometap has failed to adhere to the most important mortgage requirements that are meant to protect homeowners from predatory practices.

142.    Hometap does not evaluate homeowners' ability to pay back an HEI loan.

143.    Rather, Hometap relies on its ability to take control of the homeowners' home and force a sale in order to recover its investment.

23

144. Hometap's only concern therefore is how much the home is worth and home much it will appreciate.

145. Hometap falsely represents that its employees act in homeowners' best interests, including access to a dedicated "investment manager."

146. Homeowners are lured by Hometap's misrepresentations and omissions which lead homeowners into believing that their interests are being protected.

147. Despite terms in the HEI contract acknowledging that Hometap urged homeowners to seek outside legal and financial advice, Hometap does no such thing, instead intentionally leading homeowners to believe that Hometap is acting as their advisor.

148. Hometap markets the HEI as an "investment," despite an HEI having none of the characteristics of an investment, such as the potential to earn a profit, at least from the perspective of a homeowner.

149. Homeowners are led to believe that an HEI is not only an investment, but a good investment, when its terms are grossly unfair and favorable only to Hometap.

150. Hometap also markets HEIs as an alternative to burdensome debt or a reverse mortgage, despite those financial instruments being more tightly regulated than HEIs and HEIs essentially working in the same way as those instruments, only with much less fair terms.

151. Hometap targets homeowners who desperately need cash, and who are therefore also unlikely to be sufficiently financially literate to recognize or understand the pitfalls of the HEI contract or able to pay for third-party legal or financial advice.

152. Hometap takes advantage of its superior bargaining power, knowledge, and influence to induce homeowners into agreeing to HEI contracts.

153.    The terms of an HEI are so grossly unfair and one-sided that a competent legal or financial advisor acting in good faith would never recommend it to a homeowner.

154.    In fact, the terms of an HEI yield annualized interest rates so high that they far exceed maximum usury rates, rendering the contracts illegal.

155.    Another disadvantage of an HEI is that, because it is not considered a mortgage, it does not permit homeowners to take advantage of the mortgage interest deduction.

156.    Taking advantage of its characterization of an HEI as an "option" instead of a regulated mortgage product, Hometap dictates grossly unfavorable terms and intentionally withholds required disclosures that are meant to inform homeowners about the pitfalls of predatory lending practices.

157.    Hometap takes advantage of homeowners by not providing many of the required disclosures for residential mortgage loans under the TILA and HOEPA.

158.    Hometap withholds various TILA disclosures, including the finance charge disclosure, 15 U.S.C. §1635(i), and credit terms disclosure, 15 U.S.C. §1638.

159.    Hometap withholds additional TILA and HOEPA disclosures for "high-cost mortgages," including conspicuous disclosure of the risks of the loan, APR, and payments. 12 C.F.R. § 1026.32(c).

160.    An HEI includes a balloon payment which is prohibited in high-cost mortgages. 12 C.F.R. § 1026.32(d)(1)(i).

161.    When a homeowner ultimately does want to get out of their HEI, they are required to pay closing fees, including an appraisal fee before they can even know how much money they owe.

25

162.    Hometap also includes a mandatory arbitration provision in the HEI contract, which is prohibited by the TILA and HOEPA.

163.    Plaintiffs and Class members reasonably believed that they were being offered a home equity loan because the Investment Amount was determined based on their equity in their home.

164.    Plaintiffs and Class members reasonably believed that the terms of the HEI were favorable because of the advice they received from Hometap.

165.    Plaintiffs and Class members reasonably believed that the terms of the HEI were more favorable than other types of loans because of the advice they received from Hometap.

166.    Hometap never revealed to Plaintiffs and Class members that an HEI was actually a predatory high-interest loan that was carefully crafted with illusory contract language to avoid regulation.

167.    No Hometap employee ever urged Plaintiffs and Class members to seek outside legal and financial advice.

168.    Plaintiffs and Class members relied on Hometap's misrepresentations, omissions, and concealment of material information when entering into the HEI contract.

169.    Immediately upon entering into their HEI contracts, in order to pay off and exit the contract, in addition to closing costs, Plaintiffs and Class members would owe Hometap approximately 67% more than their Investment Amounts.

170.    If Hometap exercises the option at end of the 10-year option period, in addition to closing costs, Plaintiffs and Class members would owe 2-4 times more than their Investment Amount.

171. In consideration of Hometap's obtaining a share of Plaintiffs and Class members' homes after 10 years, Hometap would pay to Plaintiffs and Class members the Exercise Payment of only a few hundred dollars, far less than the value of the share that Hometap takes.

172. When viewed not as an option, but as a mortgage loan, the 10-year repayment represents an extremely high and grossly unfair annual interest rate.

173. Hometap had a duty to inform Plaintiffs and Class members that an HEI works in the same way as a mortgage loan which results in extremely high and grossly unfair annual interest rates because Hometap had superior knowledge and understanding of the terms of the contract, and Plaintiffs and Class members could not reasonably have been expected to interpret and understanding the terms of the contract.

174. Hometap mispresented, concealed, and omitted material information concerning the HEI in order to induce Plaintiffs and Class members to enter into the contract and agree to grossly unfair and unconscionable terms.

175. Plaintiffs and Class members reasonably and justifiably relied on Hometap's representations and advertisements when entering into the HEI contracts.

176. Plaintiffs and Class members would not have entered into an HEI contract had they known the material information that Hometap mispresented, concealed, and omitted, or they would have demanded more favorable terms.

177. Hometap acted in bad faith and with intent to violate the TILA because:

   a. Hometap marketed, represented, offered, and entered into the HEI contract with gross disregard for Plaintiffs and Class members' rights and wellbeing;

   b. Hometap marketed, represented, offered, and entered into the HEI contract with intent to take advantage of and defraud Plaintiffs and Class members; and

c.      Hometap sought to unjustly enrich themselves to the detriment of Plaintiffs and Class members.

178.   Hometap's conduct constitutes violations of the TILA.

179.   As a direct and proximate result of Hometap's conduct, Plaintiffs and Class members have been injured and sustained damages.

**COUNT II**
**VIOLATIONS OF THE PENNSYLVANIA USURY LAW**
**41 Pa. Stat. Ann. § 101, *et seq.***
**(on behalf of Plaintiffs and the Class)**

180.   All preceding paragraphs are incorporated by reference as though fully set forth herein.

181.   The Pennsylvania Usury Law, 41 Pa. Stat. Ann. § 101 *et seq.*, sets the maximum interest rate for a residential mortgage at "the Monthly Index of Long Term United States Government Bond Yields for the second preceding calendar month plus an additional two and one-half per cent per annum." 41 Pa. Stat. Ann. § 301(b).

182.   If a residential mortgage has a variable interest rate, the following additional requirements apply:

(1) That the index for determining increase or decrease in interest rate shall be the lawful rate of interest as determined under subsections (a), (b) and (c) for residential mortgages.

(2) A requirement that when an increase in the interest rate is required by a movement in a particular direction of the prescribed standard an identical decrease is required in the interest rate by a movement in the opposite direction of the prescribed standard.

(3) The rate of interest shall change not more often than once during any semiannual period and at least six months shall elapse between any two such changes.

(4) The change in the interest rate shall be one-fourth of one per cent in any semiannual period and shall not result in a rate more or less

than two and five-tenths percentage points greater or less than the rate for the first loan payment due after the closing of the loan.

(5) The rate of interest shall not change during the first annual period of the loan.

(6) Subject to the provisions of paragraphs (3), (4) and (5), an increase or decrease in the interest rate shall be effected when the index moves in such percentage that the difference between the present index rate and present mortgage rate varies not less than one-fourth of a percentage point from the difference between the index and mortgage rates at the date of the first contracted loan repayment.

41 Pa. Stat. Ann. § 301(e).

183.    An HEI is an extension of consumer credit, a residential mortgage loan, and a high-cost mortgage under the TILA, 15 U.S.C. § 1602, and the Pennsylvania Usury Law, 41 Pa. Stat. Ann. § 101.

184.    Because HEIs are in reality high-interest residential mortgage loans and not option contracts, they are subject to the statutory requirements set forth above.

185.    Immediately upon entering into their HEI contracts, in order to pay off and exit the contract, in addition to closing costs, Plaintiffs and Class members would owe Hometap approximately 67% more than their Investment Amounts.

186.    If Hometap exercises the option at end of the 10-year option period, in addition to closing costs, Plaintiffs and Class members would owe 2-4 times more than their Investment Amount.

187.    In consideration of Hometap's obtaining a share of Plaintiffs and Class members' homes after 10 years, Hometap would pay to Plaintiffs and Class members the Exercise Payment of only a few hundred dollars, far less than the value of the share that Hometap takes.

188.    When viewed not as an option, but as a mortgage loan, the 10-year repayment represents an extremely high and grossly unfair annual interest rate.

189.    In Plaintiffs' case, their HEI contract's annual interest rate over the 10-year period is 12.47%.

190.    At the time Plaintiff entered into the HEI contract, May 2021, the maximum rate for a residential mortgage loan under the Pennsylvania Usury Law was 4.5%.[10]

191.    Hometap's conduct constitutes violations of the Pennsylvania Usury Law.

192.    As a direct and proximate result of Hometap's conduct, Plaintiffs and Class members have been injured and sustained damages.

## COUNT III
### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### 73 Pa. Stat. § 201-1, *et seq.*
### (on behalf of Plaintiffs and the Class)

193.    All preceding paragraphs are incorporated by reference as though fully set forth herein.

194.    An HEI is an extension of consumer credit, a residential mortgage loan, and a high-cost mortgage under the TILA, 15 U.S.C. § 1602, and the Pennsylvania Usury Law, 41 Pa. Stat. Ann. § 101.

195.    Because HEIs are in reality high-interest residential mortgage loans and not option contracts, they are subject to the statutory requirements set forth above.

196.    Hometap has failed to adhere to the most important mortgage requirements that are meant to protect homeowners from predatory practices.

197.    Hometap does not evaluate homeowners' ability to pay back an HEI loan.

198.    Rather, Hometap relies on its ability to take control of the homeowners' home and force a sale in order to recover its investment.

---

[10] https://www.pa.gov/content/dam/copapwp-pagov/en/dobs/documents/act-6-rates/ACT%206%20Ceiling%20Index%20Residential%20-%20Historical.pdf

199.    Hometap's only concern therefore is how much the home is worth and home much it will appreciate.

200.    Hometap falsely represents that its employees act in homeowners' best interests, including access to a dedicated "investment manager."

201.    Homeowners are lured by Hometap's misrepresentations and omissions which lead homeowners into believing that their interests are being protected.

202.    Despite terms in the HEI contract acknowledging that Hometap urged homeowners to seek outside legal and financial advice, Hometap does no such thing, instead intentionally leading homeowners to believe that Hometap is acting as their advisor.

203.    Hometap markets the HEI as an "investment," despite an HEI having none of the characteristics of an investment, such as the potential to earn a profit, at least from the perspective of a homeowner.

204.    Homeowners are led to believe that an HEI is not only an investment, but a good investment, when its terms are grossly unfair and favorable only to Hometap.

205.    Hometap also markets HEIs as an alternative to burdensome debt or a reverse mortgage, despite those financial instruments being more tightly regulated than HEIs and HEIs essentially working in the same way as those instruments, only with much less fair terms.

206.    Hometap targets homeowners who desperately need cash, and who are therefore also unlikely to be sufficiently financially literate to recognize or understand the pitfalls of the HEI contract or able to pay for third-party legal or financial advice.

207.    Hometap takes advantage of its superior bargaining power, knowledge, and influence to induce homeowners into agreeing to HEI contracts.

208. The terms of an HEI are so grossly unfair and one-sided that a competent legal or financial advisor acting in good faith would never recommend it to a homeowner.

209. In fact, the terms of an HEI yield annualized interest rates so high that they far exceed maximum usury rates, rendering the contracts illegal.

210. Another disadvantage of an HEI is that, because it is not considered a mortgage, it does not permit homeowners to take advantage of the mortgage interest deduction.

211. Taking advantage of its characterization of an HEI as an "option" instead of a regulated mortgage product, Hometap dictates grossly unfavorable terms and intentionally withholds required disclosures that are meant to inform homeowners about the pitfalls of predatory lending practices.

212. Hometap takes advantage of homeowners by not providing many of the required disclosures for residential mortgage loans under the TILA and HOEPA.

213. Hometap withholds various TILA disclosures, including the finance charge disclosure, 15 U.S.C. §1635(i), and credit terms disclosure, 15 U.S.C. §1638.

214. Hometap withholds additional TILA and HOEPA disclosures for "high-cost mortgages," including conspicuous disclosure of the risks of the loan, APR, and payments. 12 C.F.R. § 1026.32(c).

215. An HEI includes a balloon payment which is prohibited in high-cost mortgages. 12 C.F.R. § 1026.32(d)(1)(i).

216. When a homeowner ultimately does want to get out of their HEI, they are required to pay closing fees, including an appraisal fee before they can even know how much money they owe.

32

217. Hometap also includes a mandatory arbitration provision in the HEI contract, which is prohibited by the TILA and HOEPA.

218. Plaintiffs and Class members reasonably believed that they were being offered a home equity loan because the Investment Amount was determined based on their equity in their home.

219. Plaintiffs and Class members reasonably believed that the terms of the HEI were favorable because of the advice they received from Hometap.

220. Plaintiffs and Class members reasonably believed that the terms of the HEI were more favorable than other types of loans because of the advice they received from Hometap.

221. Hometap never revealed to Plaintiffs and Class members that an HEI was actually a predatory high-interest loan that was carefully crafted with illusory contract language to avoid regulation.

222. No Hometap employee ever urged Plaintiffs and Class members to seek outside legal and financial advice.

223. Plaintiffs and Class members relied on Hometap's misrepresentations, omissions, and concealment of material information when entering into the HEI contract.

224. Immediately upon entering into their HEI contracts, in order to pay off and exit the contract, in addition to closing costs, Plaintiffs and Class members would owe Hometap approximately 67% more than their Investment Amounts.

225. If Hometap exercises the option at end of the 10-year option period, in addition to closing costs, Plaintiffs and Class members would owe 2-4 times more than their Investment Amount.

226.    In consideration of Hometap's obtaining a share of Plaintiffs and Class members' homes after 10 years, Hometap would pay to Plaintiffs and Class members the Exercise Payment of only a few hundred dollars, far less than the value of the share that Hometap takes.

227.    When viewed not as an option, but as a mortgage loan, the 10-year repayment represents an extremely high and grossly unfair annual interest rate.

228.    Hometap had a duty to inform Plaintiffs and Class members that an HEI works in the same way as a mortgage loan which results in extremely high and grossly unfair annual interest rates because Hometap had superior knowledge and understanding of the terms of the contract, and Plaintiffs and Class members could not reasonably have been expected to interpret and understanding the terms of the contract.

229.    Hometap mispresented, concealed, and omitted material information concerning the HEI in order to induce Plaintiffs and Class members to enter into the contract and agree to grossly unfair and unconscionable terms.

230.    Plaintiffs and Class members reasonably and justifiably relied on Hometap's representations and advertisements when entering into the HEI contracts.

231.    Plaintiffs and Class members would not have entered into an HEI contract had they known the material information that Hometap mispresented, concealed, and omitted, or they would have demanded more favorable terms.

232.    Hometap acted in bad faith and with intent to defraud because:

    a.    Hometap marketed, represented, offered, and entered into the HEI contract with gross disregard for Plaintiffs and Class members' rights and wellbeing;

    b.    Hometap marketed, represented, offered, and entered into the HEI contract with intent to take advantage of and defraud Plaintiffs and Class members; and

34

      c.     Hometap sought to unjustly enrich themselves to the detriment of Plaintiffs and Class members.

233. Hometap's conduct constitutes deceptive and unfair trade practices.

234. As a direct and proximate result of Hometap's conduct, Plaintiffs and Class members have been injured and sustained damages.

**COUNT IV**
**DECLARATORY JUDGMENT**
**15 U.S.C. § 2201**
**(on behalf of Plaintiffs and the Class)**

235. All preceding paragraphs are incorporated by reference as though fully set forth herein.

236. The Truth in Lending Act of 1968, 15 U.S.C. §1602 *et seq*. ("TILA"), protects borrowers by requiring lenders to disclose standardized loan terms and costs.

237. The Home Ownership and Equity Protection Act of 1994 ("HOEPA") amended the TILA to provide greater protections against predatory lending.

238. The TILA's implementing regulations, Regulation Z, 12 C.F.R. Part 1026, generally require that disclosures be made "clearly and conspicuously" and prohibit misleading, deceptive, and unfair practices associate with consumer credit.

239. Under the TILA, "[t]he term 'residential mortgage loan' means any consumer credit transaction that is secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling or on residential real property that includes a dwelling . . . ." 15 U.S.C. § 1602(dd)(5).

240. With respect to residential mortgage loans, the TILA has a stated purpose "to assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect

35

their ability to repay the loans and that are understandable and not unfair, deceptive or abusive."

15 U.S.C. § 1639b(a)(2).

241.    Mortgage originators must be licensed under applicable federal and state laws. 15

U.S.C § 1639b(b)(1)(A).

242.    Mortgage lenders are obligated to "make[] a reasonable and good faith

determination based on verified and documented information that, at the time the loan is

consummated, the consumer has a reasonable ability to repay the loan, according to its terms, and

all applicable taxes, insurance (including mortgage guarantee insurance), and assessments." 15

U.S.C. § 1639c(a)(1).

243.    "[A] consumer's ability to repay a residential mortgage loan shall include

consideration of the consumer's credit history, current income, expected income the consumer is

reasonably assured of receiving, current obligations, debt-to-income ratio or the residual income

the consumer will have after paying non-mortgage debt and mortgage-related obligations,

employment status, and other financial resources other than the consumer's equity in the dwelling

or real property that secures repayment of the loan. A creditor shall determine the ability of the

consumer to repay using a payment schedule that fully amortizes the loan over the term of the

loan." 15 U.S.C. § 1639c(a)(3).

244.    Residential mortgage loans are required to have certain disclosures to ensure certain

terms are specifically states in terms that homeowners understand, including:

   a.    "[t]he 'amount financed', using that term, which shall be the amount of credit of which the consumer has actual use," 15 U.S.C. § 1638(a)(2)(A);

   b.    "a statement of the consumer's right to obtain, upon a written request, a written itemization of the amount financed," 15 U.S.C. § 1638(a)(2)(B);

   c.    "[t]he 'finance charge', not itemized, using that term," 15 U.S.C. § 1638(a)(3);

d.    "[t]he finance charge expressed as an 'annual percentage rate', using that term," 15 U.S.C. § 1638(a)(4);

e.    "[d]escriptive explanations of the terms 'amount financed', 'finance charge', 'annual percentage rate', 'total of payments', and 'total sale price,'" 15 U.S.C. § 1638(a)(8);

f.    "[w]here the credit is secured, a statement that a security interest has been taken in (A) the property which is purchased as part of the credit transaction, or (B) property not purchased as part of the credit transaction identified by item or type," 15 U.S.C. § 1638(a)(9);

g.    "the total amount of interest that the consumer will pay over the life of the loan as a percentage of the principal of the loan," 15 U.S.C. § 1638(a)(19);

245. The Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 *et seq.* ("RESPA"), also requires certain disclosures and governs the settlement process.

246. Under RESPA regulations, a mortgage servicer may not charge a fee to provide information to a borrower, such as the payoff amount of the loan. 12 C.F.R. § 1024.36(g)(1).

247. The Pennsylvania Mortgage Licensing Act, *et seq.*, similarly requires a lender to provide a payoff statement upon request. 7 Pa. Stat. and Cons. Stat. Ann. § 6121(7).

248. The TILA prohibits residential mortgage loans from having mandatory arbitration provisions. 15 U.S.C. § 1639c(e)(1).

249. An HEI is an extension of consumer credit, a residential mortgage loan, and a high-cost mortgage under the TILA, 15 U.S.C. § 1602, and the Pennsylvania Usury Law, 41 Pa. Stat. Ann. § 101.

250. Because HEIs are in reality high-interest residential mortgage loans and not option contracts, they are subject to the statutory requirements set forth above.

251. Hometap has failed to adhere to the most important mortgage requirements that are meant to protect homeowners from predatory practices.

252. Hometap does not evaluate homeowners' ability to pay back an HEI loan.

253. Rather, Hometap relies on its ability to take control of the homeowners' home and force a sale in order to recover its investment.

254. Hometap's only concern therefore is how much the home is worth and home much it will appreciate.

255. Hometap falsely represents that its employees act in homeowners' best interests, including access to a dedicated "investment manager."

256. Homeowners are lured by Hometap's misrepresentations and omissions which lead homeowners into believing that their interests are being protected.

257. Despite terms in the HEI contract acknowledging that Hometap urged homeowners to seek outside legal and financial advice, Hometap does no such thing, instead intentionally leading homeowners to believe that Hometap is acting as their advisor.

258. Hometap markets the HEI as an "investment," despite an HEI having none of the characteristics of an investment, such as the potential to earn a profit, at least from the perspective of a homeowner.

259. Homeowners are led to believe that an HEI is not only an investment, but a good investment, when its terms are grossly unfair and favorable only to Hometap.

260. Hometap also markets HEIs as an alternative to burdensome debt or a reverse mortgage, despite those financial instruments being more tightly regulated than HEIs and HEIs essentially working in the same way as those instruments, only with much less fair terms.

261. Hometap targets homeowners who desperately need cash, and who are therefore also unlikely to be sufficiently financially literate to recognize or understand the pitfalls of the HEI contract or able to pay for third-party legal or financial advice.

262. Hometap takes advantage of its superior bargaining power, knowledge, and influence to induce homeowners into agreeing to HEI contracts.

263. The terms of an HEI are so grossly unfair and one-sided that a competent legal or financial advisor acting in good faith would never recommend it to a homeowner.

264. In fact, the terms of an HEI yield annualized interest rates so high that they far exceed maximum usury rates, rendering the contracts illegal.

265. Another disadvantage of an HEI is that, because it is not considered a mortgage, it does not permit homeowners to take advantage of the mortgage interest deduction.

266. Taking advantage of its characterization of an HEI as an "option" instead of a regulated mortgage product, Hometap dictates grossly unfavorable terms and intentionally withholds required disclosures that are meant to inform homeowners about the pitfalls of predatory lending practices.

267. Hometap takes advantage of homeowners by not providing many of the required disclosures for residential mortgage loans under the TILA and HOEPA.

268. Hometap withholds various TILA disclosures, including the finance charge disclosure, 15 U.S.C. §1635(i), and credit terms disclosure, 15 U.S.C. §1638.

269. Hometap withholds additional TILA and HOEPA disclosures for "high-cost mortgages," including conspicuous disclosure of the risks of the loan, APR, and payments. 12 C.F.R. § 1026.32(c).

270. An HEI includes a balloon payment which is prohibited in high-cost mortgages. 12 C.F.R. § 1026.32(d)(1)(i).

271.    When a homeowner ultimately does want to get out of their HEI, they are required to pay closing fees, including an appraisal fee before they can even know how much money they owe.

272.    Hometap also includes a mandatory arbitration provision in the HEI contract, which is prohibited by the TILA and HOEPA.

273.    Plaintiffs and Class members reasonably believed that they were being offered a home equity loan because the Investment Amount was determined based on their equity in their home.

274.    Plaintiffs and Class members reasonably believed that the terms of the HEI were favorable because of the advice they received from Hometap.

275.    Plaintiffs and Class members reasonably believed that the terms of the HEI were more favorable than other types of loans because of the advice they received from Hometap.

276.    Hometap never revealed to Plaintiffs and Class members that an HEI was actually a predatory high-interest loan that was carefully crafted with illusory contract language to avoid regulation.

277.    No Hometap employee ever urged Plaintiffs and Class members to seek outside legal and financial advice.

278.    Plaintiffs and Class members relied on Hometap's misrepresentations, omissions, and concealment of material information when entering into the HEI contract.

279.    Immediately upon entering into their HEI contracts, in order to pay off and exit the contract, in addition to closing costs, Plaintiffs and Class members would owe Hometap approximately 67% more than their Investment Amounts.

280.     If Hometap exercises the option at end of the 10-year option period, in addition to closing costs, Plaintiffs and Class members would owe 2-4 times more than their Investment Amount.

281.     In consideration of Hometap's obtaining a share of Plaintiffs and Class members' homes after 10 years, Hometap would pay to Plaintiffs and Class members the Exercise Payment of only a few hundred dollars, far less than the value of the share that Hometap takes.

282.     When viewed not as an option, but as a mortgage loan, the 10-year repayment represents an extremely high and grossly unfair annual interest rate.

283.     Hometap had a duty to inform Plaintiffs and Class members that an HEI works in the same way as a mortgage loan which results in extremely high and grossly unfair annual interest rates because Hometap had superior knowledge and understanding of the terms of the contract, and Plaintiffs and Class members could not reasonably have been expected to interpret and understanding the terms of the contract.

284.     Hometap mispresented, concealed, and omitted material information concerning the HEI in order to induce Plaintiffs and Class members to enter into the contract and agree to grossly unfair and unconscionable terms.

285.     Plaintiffs and Class members reasonably and justifiably relied on Hometap's representations and advertisements when entering into the HEI contracts.

286.     Plaintiffs and Class members would not have entered into an HEI contract had they known the material information that Hometap mispresented, concealed, and omitted, or they would have demanded more favorable terms.

287.     Hometap acted in bad faith and with intent to violate the TILA because:

     a.     Hometap marketed, represented, offered, and entered into the HEI contract with gross disregard for Plaintiffs and Class members' rights and wellbeing;

41

b.     Hometap marketed, represented, offered, and entered into the HEI contract with intent to take advantage of and defraud Plaintiffs and Class members; and

c.     Hometap sought to unjustly enrich themselves to the detriment of Plaintiffs and Class members.

288.    Hometap's conduct in drafting and entering into the HEI contracts is procedurally unconscionable, and the HEI contracts are substantively unconscionable, and the HEI contracts are therefore voidable by Plaintiffs and Class members.

289.    The HEI contract is illegal under federal and state law and therefore void.

290.    Plaintiffs seek a declaratory judgment that the HEI contract is voidable or void.

## PRAYER FOR RELIEF

WHEREFORE, the following relief is requested:

a.     An order certifying this action as a class action.

b.     An award of statutory, compensatory, incidental, consequential, and punitive damages and restitution to the extent permitted by law in an amount to be proven at trial.

c.     An order enjoining Defendants' unlawful conduct.

d.     An order declaring the rights of the parties.

e.     An award of attorneys' fees, expert witness fees, costs, and Class representative incentive awards as provided by applicable law.

f.     An award of interest as provided by law, including pre-judgment and post-judgment interest.

g.     Such other and further relief as this Court may deem just, equitable, or proper.

## JURY DEMAND

Trial by jury is demanded.

Dated: May 11, 2026

Respectfully submitted,

*/s/ D. Aaron Rihn*

D. Aaron Rihn, Esquire
PA I.D. No.: 85752
Sara J. Watkins, Esquire
PA I.D. No.: 325770
Stanley D. Ference IV, Esquire
PA I.D. No.: 336090
ROBERT PEIRCE & ASSOCIATES, PC
437 Grant Street, Suite 1100
Pittsburgh, PA 15219
Tel: 412-281-7229
Email: arihn@peircelaw.com
          swatkins@peircelaw.com
          mference@peircelaw.com

Daniel C. Levin, Esquire
PA Bar I.D. No.: 80013
LEVIN SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
Email: dlevin@lfsblaw.com